**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>JSM CONSULTING INC.,<br><br>                Debtor[1]. | Case No.<br><br>Chapter 11<br><br>(Subchapter V) |

## DECLARATION OF MUKESH SOMANI PURSUANT TO
## LBR 1007-2 AND IN SUPPORT OF THE PETITION PURSUANT TO
## SUBCHAPTER V OF THE BANKRUPTCY CODE AND RELATED PLEADINGS

        I, **MUKESH SOMANI**, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

        1.     I am the Chief Executive Officer of JSM Consulting Inc. (the "Debtor"), which is a New Jersey corporation.

        2.     I have served as the Debtor's CEO since April 2012. In this role I have become familiar with the Debtor's history, day-to-day operations, business and financial affairs, and books and records.

        3.     On October 18, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") with this Court for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

        4.     The Debtor is managing its affairs as debtor and debtor-in-possession pursuant and subject to the requirements of sections 1182(a) and 1184 of the Bankruptcy Code.

---

[1] The last four digits of the Debtor's federal tax identification number are 0191. The mailing address for the Debtor is 65 Station Road, Cranbury, New Jersey 08512.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and other employees as well as the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs or my opinions based upon my experience and knowledge.

6.      I am authorized to submit this declaration (the "Declaration") on behalf of the Debtor and, if called to testify, I could and would testify competently to the facts set forth in this Declaration.

7.      This Declaration is made pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in support of the Petition and the motions and applications for relief filed contemporaneously with or shortly after the Petition.

8.      To familiarize the Court with the Debtor and the relief that the Debtor seeks early in this Chapter 11 case, this Declaration is organized in four parts. **Part I** introduces the Debtor and details its corporate history, business operations and capital structure. **Part II** describes the circumstances surrounding the commencement of this Chapter 11 case. **Part III** summarizes the Debtor's goals for this bankruptcy. **Part IV** briefly addresses the Pleadings (as defined below) and incorporates the facts set forth in each of the Pleadings, as if fully set forth in this Declaration.

9.      Local Rule 1007-2 requires certain information related to the Debtor, which is set forth below or in documents that will be filed imminently. The balance of the information requested will be included in the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, which the Debtor has already filed. The financial information set forth below is

2

unaudited. The Debtor believes the information provided below or in the Schedules of Assets and Liabilities and Statement of Financial Affairs satisfies the requirements of Local Rule 1007-2.

## PART I – THE DEBTOR'S BUSINESS

**A.      Background, Corporate Structure, and History**

10.      The Debtor is a woman/minority owned small business incorporated in the State of New Jersey. The Debtor was incorporated in 2011. The sole shareholder of the Debtor is my spouse, Rashmi Somani.

11.      The Debtor is a management consulting company that specializes in staff augmentation. In particular, the Debtor specializes in providing its clients with experienced information technology professionals, as well as other professionals.

12.      Generally speaking, the Debtor identifies candidates that will fit its client's needs and provides them on a contract basis, for which it earns a fee. The Debtor pays the employee and withholds payroll taxes. The Debtor provides the candidates with benefits and has the right to hire and fire. On the other hand, the Debtor's clients supervise the candidates' day-to-day work, control the conditions of the work site, and determines the length of assignment. Alternatively, the Debtor contracts with separate independent staffing companies who provide employees to its clients.

13.      The Debtor operates out of an office located at 65 Station Road, Cranbury, New Jersey. The office is owned by a related entity, JSM Real Estate LLC (the "Landlord"), to which it pays rent on a monthly basis pursuant to the terms of a written lease. As of the Petition Date, the Debtor has approximately 53 employees.

**B.    Prepetition Debt Structure and Business Model**

14.    The Debtor has two (2) secured lenders, the Small Business Administration (the "SBA") and TD Bank, N.A. ("TD Bank"). As of the Petition Date, the SBA, pursuant to the provisions of a term loan, is owed approximately $150,000. The SBA has a blanket lien on all the Debtor's assets, including accounts receivable. As of the Petition Date, TD Bank, pursuant to a line of credit, is owed approximately $325,000. TD Bank also has a blanket lien on the Debtor's assets, including accounts receivable. The SBA and TD Bank have filed UCC-1 Financing Statements and Continuation Statements where applicable to perfect their security interests. The Debtor has yet to investigate the validity of the Lenders' liens. Thus, it is not presently acknowledging the validity of their liens and reserves all rights in connection therewith.

15.    As of the Petition Date, the Debtor had fewer than forty (40) trade creditors, to whom it owes a total of approximately $230,000. Generally, the Debtor is within terms and is paying these trade debts as they come due.

16.    As set forth in the Debtor's Statement of Financial Affairs, its gross revenues for 2021 are approximately $7.1 million. For the year 2020, the Debtor's gross revenues were approximately $8.4 million. For the year 2019, the Debtor's gross revenues were approximately $5.3 million.

17.    As mentioned above, the Debtor provides its clients with staff augmentation services. Following industry standards in this field, the Debtor provides its clients with employees for short or temporary periods on a contract basis. Because these companies do not want to hire a permanent employee but have a need for good staff to fill specific positions, the Debtor can provide as-needed employees based on a contractual rate agreed upon between the Debtor and the client. -. -Based on the contractual rate that the Debtor receives from the client, an hourly/yearly salary is

4

offered to the employee after the Debtor deducts its profit and expenses from the rate that it receives from the client. Because the contract is negotiated between both the worker and the corporation seeking a temporary worker, staffing companies, like the Debtor, do not have to pay employees when they are not needed, thus providing savings to its clients.

### PART II – EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE

18.     On or about April 13, 2012, the Debtor entered into a "Subvendor Master Agreement – Staffing Services" ("IIT Agreement") with IIT, Inc. ("IIT"), a New York-based information technology solutions and staffing company.

19.     Pursuant to the IIT Agreement, IIT engaged the Debtor to provide certain sub-vendor services. IIT directed the Debtor to provide certain sub-vendor services to various public entities, including the State of New York, the New York City Metropolitan Transit Authority ("MTA"), and the New York City Housing Authority ("NYCHA").

20.     In connection with the IIT Agreement, JSM provided sub-vendor services to NYCHA during the months of September, October, and November 2018.

21.     It was the practice of the Debtor, in keeping with the terms of the IIT Agreement, and in line with the ordinary course of dealing between the Debtor and IIT, for the Debtor to periodically invoice IIT for the services the Debtor rendered to IIT's clients, including NYCHA. It was the parties' practice for IIT to bill its clients directly, and for IIT to then pay the Debtor after having been paid by its clients.

22.     In keeping with the above billing practices, the Debtor issued IIT a series of invoices for the work it performed for NYCHA from September 3, 2018 through November 16, 2018. The total amount due and payable on those invoices is $276,439.50. IIT accepted the invoices without objection.

23.     In fact, IIT has stipulated that NYCHA paid IIT for the work performed by the Debtor which was the subject of the invoices.

24.     Despite having received payment from NYCHA, IIT refused to pay the Debtor for the services rendered, accepted, and reflected in the invoices.

25.     On or about June 25, 2018, the Debtor submitted a proposal in response to NYCHA Request for Proposal ("RFP") No. 66832, NYCHA for "General, Professional and Technical – Information Technology Staff Augmentation Services" (the "NYCHA Bid").

26.     IIT also submitted a bid in response to NYCHA RFP No. 66832. IIT's bid was not accepted by the NYCHA. I understand that the NYCHA informed IIT that its bid was ranked in tenth place. The Debtor's bid had ranked fifth (out of seven total accepted bids) and thus accepted.

27.     IIT complained to NYCHA about the Debtor's participation in the bidding process for RFP No. 66832. IIT alleged that the Debtor breached the Agreement's restrictive covenants by engaging in competition with IIT for bids on projects.

28.     In spring 2019, the Debtor and IIT submitted their respective claims for breach of contract, including the Debtor's claims of non-payment and IIT's claims of breach of contract, to binding arbitration pursuant to an arbitration clause contained in the contract between IIT and the Debtor.

29.     On February 8, 2021, the arbitrator, the Honorable Shirley Werner Kornreich (Ret.) ("Kornreich"), issued a Partial Final Award (the "Partial Award"), in which she found, among other things, that the Debtor was liable to IIT for having breached the IIT Agreement.

30.     In connection with the Partial Award, on August 23, 2021, Kornreich awarded IIT lost profits in the amount of $1,538,602.35, together with prejudgment interest.

31.    Upon information and belief, Kornreich has scheduled further proceedings in the arbitration for later this year to fix any additional damages that may be warranted.

32.    The Debtor has a basis to and will oppose any effort to fix additional damages in the arbitration. In addition, the Debtor has a basis to and will oppose Court confirmation of any final award.

33.    It is my understanding that that damages that Kornreich may award could be significant, and if awarded and enforced, could jeopardize the Debtor's ability to operate and meet its ordinary course obligations, including obligations to its employees and other creditors.

## PART III – THE DEBTOR'S GOALS FOR THIS BANKRUPTCY

34.    The Debtor commenced this Chapter 11 case in order to reorganize its debt, including any claims of IIT, in order to maximize the reorganized value of the estate for its creditors and parties in interest. The Debtor expects to be able to file a plan of reorganization in accordance with the deadlines set forth in Subchapter V of Chapter 11 and proceed to confirmation of a plan.

35.    The centerpiece of the Debtor's plan of reorganization will be its continued performance under its contracts, the continued performance of which, will provide the necessary revenue to come out of Chapter 11.

## PART IV – THE DEBTOR'S PLEADINGS

36.    Contemporaneously herewith, the Debtor has filed a motion for an order authorizing it to (i) satisfy pre-petition payroll obligations (the "Pre-Petition Wages Motion"); (ii) pay critical vendors (the "Critical Vendor Motion"); and (iii) use the cash collateral in which the SBA and TD Bank claim an interest (the "Cash Collateral Motion"). The Debtor also intends to file an application to retain bankruptcy counsel, and an accountant with bankruptcy experience,

as well as other motions for relief intended to facilitate the efficient administration of this Chapter 11 case (collectively, the "Pleadings").

37.    I have reviewed the Pre-Petition Wages Motion, the Cash Collateral Motion and the Critical Vendors Motion and facts set forth therein are true and correct to the best of my knowledge, information and belief, and are incorporated herein as if fully set forth in this Declaration.

38.    I believe the relief sought in the Pre-Petition Wages Motion, the Cash Collateral Motion and the Critical Vendors Motion are necessary to the Debtor's efforts to preserve reorganization value and maximize recoveries and best serve the Debtor's estate and creditors' best interests.

39.    Accordingly, for the reasons stated herein and in the Pre-Petition Wages Motion, the Cash Collateral Motion and the Critical Vendors Motion, I respectfully request that these Motions be granted in their entirety.

**A.    Debtor's Motion for an Order: Authorizing the Debtor to Satisfy, and to the Extent Applicable, Direct TD Bank, N.A. to Honor, Pre-Petition Gross Salaries, Payroll Taxes, and Related Employee Benefit Obligations to or for the Benefit of the Debtor's Employees (the "Pre-Petition Wages Motion")**

40.    The Debtor filed the Pre-Petition Wage Motion on an expedited basis in order for it to be heard as part of the First Day hearings.

41.    As set forth in the Pre-Petition Wages Motion, the Debtor employs 57 individuals.

42.    The Debtor's sole means to produce its revenues is the provision of professional services by its employees and independent contractors provided by its critical vendors. Without the cooperation of its employees, the Debtor will not be able to generate a significant portion of its revenues which will be detrimental to the estate, and the maintenance of reorganization value and its ability to reorganize.

8

43.    If the Debtor is not authorized to pay its pre-petition payroll obligations and to honor the Pre-Petition Employee Benefits, the Debtor's relationship with its employees will undoubtedly suffer, the employees' morale, dedication, confidence, and cooperation might be compromised irreparably and employees may leave.

44.    As such, the Debtor respectfully requests that the Pre-Petition Wages Motion be granted.

**B.    Debtor's Motion for an Order Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 363(c)(2)(B), and 363(e) of the Bankruptcy Code and Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001 (the "Cash Collateral Motion")**

45.    As a preliminary note, the Debtor filed the Cash Collateral Motion on an expedited basis in order to be hear as part of the First Day hearings.

46.    As set forth in the Cash Collateral Motion, the SBA loaned the Debtor money and is presently owed approximately $150,000

47.    Upon information and belief, the Debtor granted the SBA a blanket lien on its personal property including, without limitation, machinery and equipment, accounts receivable, and the proceeds thereof to secure the SBA Debt.

46.    Further, TD Bank loaned the Debtor money and it is presently owed approximately $325,000.

47.    Upon information and belief, the Debtor granted TD Bank a blanket lien on its personal property, including, without limitation, machinery and equipment, accounts receivable, and the proceeds thereof to secure the TD Bank Debt.

48.    Upon information and belief the SBA and TD Bank perfected their security interests by filing UCC-1 Financing Statements and any necessary Continuation Statements in the

9

appropriate jurisdictions. The Debtor is not acknowledging the validity of the Lenders' liens and reserves all rights in connection therewith.

49.     Upon information and belief, the TD Bank Debt is personally guaranteed by me and my wife.

50.     Without the authority to use cash collateral, the Debtor cannot continue to operate which will cause a loss of reorganization value and jobs as well as precluding an ability to reorganize, thereby preventing creditors from realizing upon reorganization value.

51.     The Cash Collateral Motion seeks authority to use cash collateral to pay ordinary course expenses in accordance with a budget and to pay pre-petition wages and critical vendors as authorized by the Bankruptcy Court.

52.     The Debtor submits that the Lenders are adequately protected but also proffers additional adequate protection.

53.     As such, the Debtor respectfully requests that the Cash Collateral Motion be granted.

**C.     Debtor's Motion for an Order Authorizing the Payment of Critical Vendors (the "Critical Vendors Motion")**

54.     A portion of the individuals who provide professional services to the Debtor's clients are not employees but rather independent contractors supplied by the Debtor's critical vendors. These critical vendors bill the Debtor monthly in arrears. Thus, the Debtor owes these critical vendors for the pre-petition portion of the October billing cycle in the amount of $226,667.

55.     The Debtor believes that these critical vendors will cease providing services if they are not paid their pre-petition claims and are irreplaceable.

56.     None of the critical vendors are insiders of the Debtor.

57.     Thus, the Debtor respectfully requests that the Critical Vendor Motion be granted.

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

58.    In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain additional information related to the Debtor, which is set forth below:

### Local Rule 1007-2(a)(1)

59.    The nature of the Debtor's business and the circumstances which led to the filing of this Chapter 11 Case are discussed in detail above.

### Local Rule 1007-2(a)(2)

60.    This Chapter 11 Case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

### Local Rule 1007-2(a)(3)

61.    Upon information and belief, no committee was organized prior to Petition Date in this Chapter 11 Case.

### Local Rule 1007-2(a)(4)

62.    A list of the names, addresses and other required contact information, to the extent available, of the Debtor's twenty (20) largest unsecured creditors, excluding those who would not be entitled to vote at a meeting of creditors and creditors who are "insiders" (as that term is defined in 11 U.S.C. § 101(31) is attached to the Petition. An indication of whether the claim is contingent, unliquidated, disputed or partially secured is included on the Debtor's Schedules.

11

**Local Rule 1007-2(a)(5)**

63.    The name and addresses of the Debtor's two (2) secured creditors and the approximate amount of their respective claims are set forth on the Schedules, as well as an approximate amount of the value of the collateral securing their claims.

**Local Rule 1007-2(a)(6)**

64.    The Schedules which were filed along with the Petition set forth a summary of the Debtor's assets and liabilities.

**Local Rule 1007-2(a)(7)**

65.    There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

66.    Upon information and belief, as of the Petition Date, none of the Debtor's property was in the possession of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

67.    The Debtor operates its business from an office located at 65 Station Road, Cranbury, New Jersey (the "Office"). The office is leased from a related entity, JSM Real Estate. The Debtor has a satellite office in New York located at 3 Grace Avenue, Suite # 100, Great Neck, New York 11021.

**Local Rule 1007-2(a)(10)**

68.    Debtor's books and records are located at the Office. The Debtor's most significant asset is accounts receivable due and owing from its various clients. The Debtor only has minimal tangible assets, consisting of furniture and some office equipment.

**Local Rule 1007-2(a)(11)**

69.     Upon information and belief, the only legal action currently pending against the Debtor is the arbitration with IIT referenced above.

**Local Rule 1007-2(a)(12)**

70.     **Rashmi Somani – President –** Ms. Somani is CPA with more than 20 years of experience in running a startup and corporate accounting, extensive experience in working with fixed assets and reporting, reconciliation, sublease compliance, and accounts receivables. As the owner of the Debtor, she is primarily responsible for all important decisions taken by the Debtor.

**Mukesh Somani – CEO -** Mr. Somani has more than 19 years of experience in developing and managing medium to high complex systems. Mr. Somani has worked in various capacities throughout his career (Developer, Technical Lead, Deployment Manager and Project Manager). Mr Somani is currently the CEO of the Debtor and is responsible for bringing new business and supporting existing clients.

**Vivek Shenoy – Senior Vice President – Operations -** Mr Shenoy has 20+ years of diverse industry experience including Recruitment & IT in Operations, Business Development, Recruitment, Client Servicing and Training. Mr. Shenoy is working as SVP taking care of day-to-day work fulfilling client needs and working closely with the CEO in connection with bringing in new clients and consultants. He is the main point-of-contact for all existing clients and consultants. All departments including client accounting, contracts, and HR report to him on daily basis.

**Shreerang Tarte – Talent Acquisitions – HR -** Mr. Shreerang Tarte has a Masters degree in Human Resource with 20+ years' experience in Operations, Human Resources, Process Improvements and General Compliance. At the Debtor, he is responsible for Immigration, Vendor

13

Management, Staffing, Onboarding, Contract Management, IT Procurement and General Compliance.

**Swarnalatha Akula – Accounting Manager-** Swarnalatha Akula is working as Accounting Manager with more than 8 years of experience in Accounting and Recruitment. She currently works on financial aspects, including quick books, accounts receivable, accounts payable, running payroll and she closely works with the President to ensure that the Debtor is financially stable.

**Cynthia von Dohln – HR Manager -** Cynthia von Dohln has 15+ years' experience and currently is entirely responsible for managing the HR Operations for the Debtor. She directs the routine functions of the departments which are responsible for hiring and interviewing staff, administering pay, benefits, and leave, and enforcing the Debtor's policies and business practices.

**Local Rule 1007-2(b)(1) and (2)**

71.     The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the Chapter 11 petition is $322,000. The estimated amount proposed to be paid to the Debtor's officers, stockholders, and directors during the thirty (30) day period following the filing of the Chapter 11 petition is $26,200.

**Local Rule 1007-2(b)(3)**

72.     A schedule, for the thirty (30) day period following the filing of the Chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, is annexed to the verified application in support of the Debtor's motion for use of cash collateral.

73.     I have read the foregoing Declaration and certify that the factual statements contained therein are true to the best of my knowledge, information and belief.

14

74.    I am aware that if any of the factual statements contained in the Declaration are willfully false, I am subject to punishment.

_____
MUKESH SOMANI